**ARCTIC KING FISHERIES, INC., Plaintiff,**

**Seafreeze Alaska Limited Partnership, Intervening–Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 99–49C.**

United States Court of Federal Claims.

Filed under seal: Jan. 27, 2004.

Reissued: Feb. 11, 2004.[1]

1. An unredacted version of this opinion was issued under seal on January 27, 2004. The court afforded the parties an opportunity to propose redactions in the opinion prior to its publication, but no such redactions were proposed. Accordingly, the opinion is reissued solely with the correction of a few typographical errors.

Richard Lee Cys, David Wright Tremaine, LLP, Washington, D.C., for plaintiff.

Gary Michael Haugen, Bauer, Moynihan and Johnson, Seattle, WA, for intervening-plaintiff, Seafreeze Alaska, Limited Partnership.

Marian E. Sullivan, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant.

## OPINION

ALLEGRA, Judge.

*"Roll on, thou deep and dark blue ocean
... ten thousand fleets sweep over
thee in vain ..."* [2]

This regulatory taking case is before the court following a trial held in Seattle, Washington. Plaintiff seeks just compensation under the Fifth Amendment, alleging that the enactment of the American Fisheries Act (AFA), Pub.L. No. 105–277 (1998), resulted in a taking of its fishing vessel and associated property interests. Based on the evidence presented, and for the reasons that follow, the court concludes that plaintiff is not entitled to recover, as no taking of its property has occurred.

## I. FINDINGS OF FACTS

### A. General facts regarding fishery management.

Congress enacted the Fishery Conservation and Management Act, commonly known as the Magnuson–Stevens Act, in 1976 with the twin goals of extending U.S. authority within a zone 200 nautical miles from the U.S. coastline and controlling foreign access to resources within this zone. *See* Magnuson–Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1882 (1998). This act established a regulatory scheme for managing commercial fisheries within the so-called U.S. Exclusive Economic Zone (EEZ), which includes the Alaska pol-

lack fishery. Containing between six and twelve million metric tons of pollack more than three years of age, the Alaska pollack fishery is one of the largest, and best managed, fishery resources in the world. Pollack is the dominant species in the Alaska groundfish complex, which also includes Pacific cod, in addition to several species of flounder, flat fish, and rock fish.

Under the Magnuson–Stevens Act, vessels larger than five net tons that seek to fish in the EEZ must first obtain both a certificate of documentation issued by the U.S. Coast Guard and a fisheries endorsement authorizing the vessel to operate in the fisheries of the United States. 46 U.S.C. §§ 12103, 12108 (1998). Fishing in the EEZ off the coast of Alaska is additionally regulated by a fishery management plan (FMP), which promotes conservation while efficiently managing the resources of the fishery and its participants. 16 U.S.C. §§ 1853, 1854 (1998). FMPs are prepared by regional fishery management councils and ultimately implemented by regulations promulgated by the National Marine Fisheries Service (NMFS). 16 U.S.C. §§ 1854, 1855 (1998).

Groundfish fisheries (including the pollack fishery) in the Alaska EEZ are managed by the North Pacific Fishery Management Council (NPFMC) via two FMPs—one for the Gulf of Alaska and another for the Bering Sea and Aleutian Islands (BSAI). The FMP regulations include annual harvest limits, fishery closure provisions, bycatch restrictions, area closures, seasonal restrictions, fishing gear limitations, recordkeeping and reporting requirements, and fishery observer coverage requirements. *See* 50 C.F.R. Part 679 (1998). Particular regulations apply to the BSAI pollack fishery, including measures relating to harvest limits, sector allocations, and retention of pollack roe.

### B. The *Arctic Trawler,* its fishing history and preliminary negotiations regarding its sale.

During the periods in question, Arctic King Fisheries (Arctic King or plaintiff) was

---

2. Lord Byron, Childe Harold's Pilgrimage, canto II, st. 179 (1812).

a subsidiary of Kaioh International Investment Corporation, in turn, a subsidiary of Kaioh Suisan.[3] Plaintiff's vessel, the F/T Arctic Trawler (Arctic Trawler), was built in the United States in 1968, first flagged as a U.S. vessel on February 6, 1969, and, according to sales documents in the record, purchased by plaintiff in 1987. The vessel was one of the first U.S. documented factory trawlers to fish for pollack in Alaska. Configured to operate primarily in the BSAI pollack fishery, the Arctic Trawler was equipped with a roe processing plant and a surimi plant (used to produce a fish paste used, most familiarly, in making artificial crab). From its introduction into the BSAI fishery until June of 1995, the Arctic Trawler generated income principally from harvesting and processing pollack, in addition to the sale of pollack-derived products. During this period, however, the vessel's owners found it increasingly difficult to realize a profit owing to the overcapitalization of the BSAI pollack fishery—what one witness colloquially referred to as having "too much steel in the water" or "too many boats chasing too few fish." The Arctic Trawler experienced difficulty in competing with more efficient vessels in what had become an "Olympic-style" fishery—an open access fishery that closes when the competing vessels reach, in aggregate, a preset tonnage limit of harvested fish.[4] Spurred by these developments, in June of 1995, Arctic King surrendered the Arctic Trawler's U.S. documentation, reflagged the vessel under the law of Belize and relocated it to Russian waters under a joint venture with a Russian firm. Despite being able to fish a longer season, the Arctic Trawler remained unprofitable while in Russia.

In September of 1995, faced with the increasing overcapitalization of the BSAI fisheries, the NPFMC implemented a new program, the Vessel Moratorium Program (VMP), to stem the flow of additional, un-needed vessels and capital investment into the fisheries under the Council's authority. On January 1, 1996, regulations establishing that program took effect. Under the VMP, new vessels were prevented from entering the Alaska groundfish fisheries, including the BSAI pollack fishery. Those desiring access to the fishery were required to procure a moratorium permit issued by the NMFS. To qualify for such a permit, the owner of a fishing vessel had to demonstrate that it had landed a moratorium species (e.g., pollack) between January 1, 1988, and February 9, 1992. While the VMP allowed moratorium qualification to be transferred upon the approval of a regulatory authority, 50 C.F.R. § 679.4(c)(8)-(9) (1998), the moratorium permits, like the regular federal fisheries permits, were not transferable.[5] The VMP regulations also provided that such permits "represent only a harvesting privilege that may be revoked or amended" and that do not give rise to an "interest that is subject to the 'takings' provisions of the Fifth Amendment." 50 C.F.R. § 679.4(a)(6) (1998). Although the VMP was successful in limiting new access to the BSAI fisheries, it was not intended to resolve the problem of excess harvesting capacity in the BSAI fishery, but instead was an interim measure designed to provide temporary industry stability while a broader solution to overcapitalization was worked out.

When the Arctic Trawler returned from Russian waters in August 1997, its owners decided to sell the vessel rather than use it to fish in the Alaska groundfish fisheries. They were prompted, at least in part, by the expense of maintaining the aging vessel and preparing it to go fishing—the vessel's moorage cost, alone, was between $600,000 and $900,000 per year. To enhance the value of the ship, plaintiff applied for and received both a Coast Guard certificate of documentation (with a fishery endorsement) and, in

---

3. At the time of trial, Arctic King was in the process of concluding its operations.

4. Competition was between vessels within a sector (e.g. inshore, offshore), each sector having been allocated a maximum quota of fish. Competition had become so fierce that what had been a year-round fishing season had effectively contracted to approximately 85 or 90 days.

5. 50 C.F.R. § 679.4(c)(9)(i) (1998) (indicating that "a moratorium permit is not transferable or assignable"); 50 C.F.R. § 679.4(b)(8) (1998) (indicating that a "Federal fisheries permit ... is not transferable or assignable and is valid only for the vessel for which it is issued").

September 1997, a VMP permit. At this time, however, Arctic King did not obtain a federal fisheries permit—also required to fish in U.S. waters—because it had no intention of actually using the vessel to fish. Taken together, the various decisions made by plaintiff's management—going to Russia and not fishing upon return—left the vessel with no reported domestic catch history after June of 1995.

Between the fall of 1997 and the summer of 1998, plaintiff received several offers to purchase the vessel and even entered into a few purchase and sale agreements with potential buyers. For various reasons, none of those agreements were consummated. Finally, on August 20, 1998, Arctic King entered into a purchase and sale contract with Trinity Seafoods, LLC (Trinity) to sell the Arctic Trawler for $2 million. Although he had originally asked $4.5 million for the vessel, the former president of Arctic King, Mr. Rick Rees, testified that plaintiff agreed to $2 million because it "was a reasonable offer from a legitimate buyer."[6] Even with this agreement looming, however, Arctic King did not obtain a federal fisheries permit for the Arctic Trawler until August 12, 1998, just before the purchase and sale agreement was executed.

### C. The rules governing pollack fishing change.

On October 1, 1998, the NPFMC and the NMFS issued final regulations to implement the License Limitation Program (LLP), replacing the VMP. *See* Fisheries of the Exclusive Economic Zone off Alaska LLP Program, 63 Fed.Reg. 52642–01 (Oct. 1, 1998). Via the Federal Register, these agencies notified the fishing industry that the new regulatory regime was merely an "interim step toward a more comprehensive solution to the conservation and management problems inherent in an overcapitalized fishery." *Id.* at 52,643.[7] To obtain an LLP permit and, thereby, continue fishing in Alaska groundfish fisheries after January 1, 2000, a vessel was required to have at least one documented harvest of any amount of licensed limitation groundfish species in two distinct periods: a general qualification period (January 1, 1988, through June 27, 1992) and an endorsement qualification period (January 1, 1992, through June 17, 1995). 50 C.F.R. § 679.4(k)(4)(i). Unlike the general qualification period, the endorsement qualification period was species specific. These dual requirements were "intended to ensure that only those vessel owners with both past dependence and recent participation in the fishery qualify." 63 Fed. Reg. at 52642–43.

The purpose of the LLP was twofold: First, like the VMP, the LLP sought to restrict the number of vessels that could engage in fishing operations within the Alaska groundfish fisheries, including the BSAI pollack fishery. Second, the LLP endeavored to restrict fishery access to those vessel owners with both past dependence on, and recent participation in, the fishery. Consistent with these purposes, the FMP for the BSAI pollack fishery allocated a harvest quota among competing sectors of the fishery, as follows: 7.5 percent was allocated to western Alaska native communities; the remaining 92.5 percent was divided between vessels serving on-shore processing plants in Alaska (35 percent) and vessels associated with at-sea processing (65 percent). Like the VMP, however, the LLP did not solve the problem of overcapitalization of the BSAI pollack fishery—it merely capped the existing capitalization and reallocated quotas among existing participants.

---

6. Another potential buyer, which had also offered $2 million, backed out of its purchase agreement with plaintiff by invoking a contingency clause relating to "major mechanical problems" with the vessel. While Mr. Rees did not believe these problems to be "major," he conceded that "some metal" was found in two of the three main propulsion engines. Arctic King undertook to rebuild the engines due, in part, to this metal; no other capital improvements, however, were made.

7. The Federal Register also noted: "The LLP is designed to be a framework program to which other programs (*e.g.*, vessel and license buyback, individual bycatch accountability, and individual fishing quotas) could be added to reduce capitalization in the future..." 63 Fed.Reg. 52643, 52648 (October 1, 1998).

Unmollified, members of the pollack industry continued to lobby Congress for a broader solution that would meet the problem of overcapitalization head on by reducing the number of participants in the BSAI pollack fishery. In September of 1998, around the time that Arctic King contracted to sell the Arctic Trawler to Trinity Seafoods, Mr. Rees learned of proposed Federal legislation that might effect the Arctic Trawler's ability to fish for pollack; however, he believed that the vessel would still be qualified to fish despite the legislation. That proposed legislation ultimately became the AFA, enacted on October 21, 1998, Pub.L. 105–277, §§ 205–13, designed, at last, not only to address comprehensively the overcapitalization in the BSAI pollack fishery, but to do so, with the express purpose of allowing all the vessels in that fishery to operate more efficiently.[8] At the time this statute passed, the Arctic Trawler was still owned by plaintiff.

In general, the AFA addressed the problem of overcapitalization by excluding certain vessels that had previously participated in the fishery and then reallocating the pollack harvest among a reduced number of participants. Toward these ends, subtitle I of the AFA created new standards for citizen ownership of vessels engaged in U.S. fisheries, while Subtitle II altered the existing regulatory regime governing the BSAI pollack fishery. Several sections of the AFA dealing with the BSAI pollack fishery are particularly relevant to the resolution of this case:

- Section 206 of the AFA modified the existing BSAI pollack fishery sector allocation. It allocated ten percent of the total allowable catch of pollack in the BSAI fishery to western Alaska native communities, with the remaining 90 percent (after deduction for bycatch of pollack) being divided among catcher-vessels harvesting pollack for onshore processing (50 percent), catcher-processor vessels including associated catcher vessels (40 percent), and catcher-vessels harvesting pollack for processing by motherships at sea (10 percent). This provision became effective on January 1, 1999.

- Section 207 of the AFA, in conjunction with section 209, engineered a "buyout" of nine named factory trawlers and the transfer of their pollack catch history to the onshore sector of the fishery. With the exception of the F/V American Empress, all of these large trawlers were required to be scrapped; the F/V American Empress was prohibited from fishing for any stock of fish that occurs within the EEZ of the United States. AFA, § 207(d)(1)(A). These vessels were made permanently ineligible for a fishery endorsement or for any present or future limited access system permit in any fishery within the EEZ of the United States. In addition, section 209 extinguished "any claims (including relating to catch history) associated with such vessels that could qualify any owners of such vessels for any present or future limited access system permit in any fishery with the [EEZ] (including a vessel moratorium permit or license limitation program permit in fisheries under the authority of the North Pacific Council)." The AFA contained no other buyout provision.

- Finally, section 208 of the AFA identified specific vessels that could continue to participate in the BSAI pollack fishery, primarily by naming the vessels and their official Coast Guard documentation numbers.[9] Other unnamed vessels could quali-

---

8. As noted in the report of one of plaintiff's experts, Mr. Steven Hughes, the "failure to limit fishing effort and other failures by [regulatory authorities] to rationalize the BS/AI pollack fishery, basically caused industry members to seek other means of securing fishing rationalization. This rationalization came in the form of the AFA." As a result of the AFA, "[t]he rush for fish... in the pollack fishery was basically ended," which according to Mr. Hughes's testimony not only benefitted the pollack fishery, by improving fleet safety and increasing production efficiency and profitability, but also benefitted

vessels operating in other Alaska ground fisheries, as well.

9. Mr. Hughes testified that none of the vessels included by name in this provision were required to have fished in particular years to be so included. Mr. Hughes also pointed out that several "named vessels," during certain years, had not recorded any catch history of pollack. However, as will be discussed further below, all of the "named vessels" had some pollack history recorded in either 1997 or 1998; by contrast, the Arctic Trawler had no recorded pollack catch for

fy to fish in the BSAI pollack fishery only if their owners could demonstrate certain pollack harvest amounts in 1997. AFA, § 208(e)(21).[10]

The Arctic Trawler was neither selected for the buyout nor among the named vessels allowed to continue fishing in the BSAI pollack fishery. *See* AFA, § 208(e)(1–20). Moreover, it did not qualify to continue operating under section 208(e)(21) because it had no recent catch history. Thus, despite the lobbying efforts of Mr. Rees, the AFA essentially cut plaintiff out of the BSAI pollack fishery.[11]

By their terms, sections 206 and 208 of the AFA were to expire on December 31, 2004, unless extended through regulations recommended by the NPFMC and adopted by the Secretary of Commerce. However, on November 28, 2001, these provisions became permanent through an amendment to the AFA contained in the Department of Commerce and Related Agencies Appropriations Act, 2002, Pub.L. No. 107–77, 115 Stat. 748, 779.

## D. Post–AFA developments.

Reciting that their actions were "a result of the enactment of the American Fisheries Act," on October 28, 1998, Arctic King and Trinity amended the contract for the sale of the Arctic Trawler to reduce the purchase price to $750,000—$1.25 million less than in the original contract. The amendment provided that the pollack surimi processing equipment would be removed from the vessel and sold separately, with the buyer and seller splitting the sales proceeds—Arctic King eventually realized $39,900 from the sale of this equipment. Trinity assigned its interest in the purchase and sale contract to United States Seafoods, Limited Partnership. The sale of the Arctic Trawler and its associated fishing rights closed on November 25, 1998, with United States Seafoods then taking title.[12] When United States Seafoods subsequently changed its name to Seafreeze Alaska, Limited Partnership, the Arctic Trawler was renamed the Seafreeze Alaska.

On the basis of the fishing history developed by plaintiff, the Seafreeze Alaska obtained a LLP permit for the vessel. The vessel currently possesses all of the certificates, permits, and licenses necessary to fish in the Alaska groundfish fisheries, except for BSAI pollack, and is currently fishing pursuant to those permits.

## E. Procedural history of this case.

On February 1, 1999, plaintiff filed a complaint in this court seeking to recover for an alleged unconstitutional taking of the Arctic Trawler effected by the enactment of the AFA. Plaintiff seeks either the $1.25 million alleged diminution in contract price or the amount allotted each vessel under the buyout provisions of the AFA (approximately $10

---

the years 1996–1998. Mr. Hughes, therefore, erred in concluding that "[t]he way the American Fisheries Act approached this problem [of continued fishery eligibility], there was not a consistent standard."

**10.** The vessel known as the F/T Ocean Peace (Ocean Peace) was the only vessel that applied, and was found eligible, for continued participation in the BSAI pollack fishery pursuant to this provision.

**11.** In his expert report, Mr. Hughes noted: "[t]he AFA effectively eliminated the pollock fishing rights of the first American flag factory trawler to enter the BS/AI pollock fishery. Further, the AFA eliminated the pollock fishing rights of the U.S. flag catcher processor with the longest history in the BS/AI pollock fishery." According to Mr. Hughes, "the AFA eliminated this F/T Arctic Trawler from the 1999 and future years BS/AI pollock fishery solely because it did not operate in the year 1997—a year completely beyond the Federal Moratorium and LLP qualification periods established by the NPFMC and approved by the Secretary of Commerce."

**12.** Mr. Hughes testified that lending banks are known to take a security interest in fishing licenses, or other fishing "rights," due to the value they impart to an associated fishing vessel. Because, under various regulatory schemes, a vessel's fishing history (*i.e.*, catch history) is the basis upon which fishing licenses are granted, a vessel's fishing history is also frequently the subject of sale. In the words of defendant's expert, Mr. John Dunnigan, Director of the Office of Sustainable Fisheries (National Marine Fishery Service), "catch history is important only to the extent that it reflects what the…fishery managers have decided they're trying to achieve with their fishery management program." Mr. Hughes, under cross-examination, basically agreed with this proposition.

million minus the benefits Arctic King received from the sale). On February 1, 2000, the court granted a motion by Seafreeze Alaska to intervene in the pending suit. Seafreeze Alaska's intervening complaint argues alternatively that, if the AFA effected a taking, either the current fishing rights of the vessel should be maintained or Seafreeze Alaska should be the primary recipient of any payment made through the buyout program, with Arctic King receiving no more than the $1.25 million reduction in contract price.

On December 18, 2000, defendant filed a motion for summary judgment. The case was subsequently reassigned to the undersigned judge. In an unpublished decision rendered April 10, 2002, this court concluded that there were genuine and material questions of fact which precluded defendant's motion from being granted. In that opinion, this court determined that "the *res* at issue here is the vessel itself, whose value was allegedly diminished by the passage of the AFA" and that the "[a]pplication of the regulatory takings test is appropriate." In addition, the court noted possible factual questions regarding whether the fishing history of the Arctic Trawler impacted its value, "and whether such history somehow constitutes a separately valued 'asset' that [could or] could not be taken." In light of "material and genuine questions of fact," this court denied defendant's summary judgment motion.

Seafreeze Alaska then filed a motion for summary judgment on May 13, 2002, arguing that plaintiff could not maintain a takings claim in this case because it sold the fishing vessel at issue, and any rights appurtenant thereto, before the effective date of the AFA. This court disagreed and ruled, on July 19, 2002, that plaintiff legally was able to assert a taking as of the date of the AFA's enactment.

Finally, on October 8, 2002, the court denied plaintiff's motion *in limine* to exclude the expert reports and testimony of two defense witnesses. The court, on that date, likewise denied defendant's motion for reconsideration of its earlier summary judgment ruling, and defendant's motion *in limine* regarding Arctic King Fisheries' damages claims.

### F. Trial: expert trial testimony on valuation.

Trial followed in Seattle, Washington between November 18–21, 2002. The sole issue was whether passage of the AFA effectuated a taking of the Arctic King. As described in greater detail below, resolution of that issue requires the court to consider three factors identified in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), focusing on: (i) the character of the government action; (ii) the extent to which the regulation interferes with reasonable investment backed expectations; and (iii) the economic impact of the regulation on plaintiffs' property. In an effort to address these factors, each side presented appraisal reports, as well as other reports and testimony by several experts.

Despite this court having focused the inquiry here on the impact of the AFA on the value of the vessel, plaintiff's expert, Mr. Steven Hughes, testified primarily about "the reduction in value of the Arctic Trawler's fishing rights as a result of losing its ability to fish in the pollock fishery because of the American Fisheries Act." He placed the loss between $11.7 and $16.8 million.[13] The low-end of that range was based on values Mr. Hughes extrapolated from the AFA itself, which he viewed as "basically transferr[ing] 95,000 metric tons of pollock from the off-shore sector to the in-shore sector" in exchange for the buyout. Because $95 million was paid to the off-shore sector under the buyout, Mr. Hughes reasoned that the in-shore sector paid, in essence, $1,000 for each metric ton of pollack transferred.[14] Mr.

---

13. Mr. Hughes reached this conclusion despite stating in his expert report that the Arctic Trawler's "August 20, 1998, agreed upon price [of $2 million] was based upon LLP qualification."

14. Mr. Hughes, however, failed to account for the value of the vessels themselves, eight of which were required to be scrapped, instead attributing the payment entirely to the fishing "rights." Indeed, Mr. Hughes admitted that he "wouldn't be qualified" to render an opinion as

Hughes then multiplied the latter figure by the Arctic Trawler's average catch per year during the LLP qualifying period of 11,700 metric tons and determined that, by not being included in the AFA, the Arctic Trawler had "lost" $11.7 million. The $16.8 million figure (*i.e.*, the high-end of the evaluated loss), was similarly calculated by multiplying the average sale price of CDQ pollack [15] during the LLP period of $240 per metric ton by the number of tons that Mr. Hughes assumed the Arctic King would have caught over a six-year period of time (calculated by multiplying the 11,700 metric ton annual average discussed above times six).[16]

Mr. Hughes did not attempt to value either the vessel itself, or even, for that matter, the value of the fishing permits which Arctic King held for the Arctic Trawler, prior to the enactment of the AFA. Nor did he opine as to the value of the Arctic Trawler absent the ability to fish for pollack just after the enactment of the AFA. Rather, Mr. Hughes focused on what, in his view, plaintiff should have received under the AFA, summarizing his valuation testimony as follows: "If the Arctic Trawler had been included in the AFA and if the qualification criteria had been the rules of the LLP ... the 11,700 metric tons

would have been their catch history" and "[t]he value of that catch history would have been in the range of $11.7 to $16.8 million."

Another of plaintiff's experts, Mr. Ronald Graves, a ship broker, placed the value of the Arctic Trawler if "it had been eligible to fish in the pollack fishery after October 21, 1998" at between $6 and $8 million.[17] Mr. Graves took into account both the general condition of the vessel and sales of comparable vessels. One of the comparable vessels that played a role in Mr. Graves' analysis was the F/V Brown's Point (Brown's Point), which sold for $1.5 million on or about July 8, 1998, and was resold for $2.5 million shortly before the passage of the AFA. Mr. Graves stated that, in his opinion, "[t]he Arctic Trawler ... definitely had a higher value than the Brown's Point." However, the Browns Point was a newer vessel, constructed approximately a decade after the Arctic Trawler, and had a different and better propulsion/electrical system. Moreover, the sale prices quoted above reflected not only the value of that vessel and its fishing history, but also its fishing rights under the prior regulatory regimes.

Like Mr. Hughes, though, Mr. Graves valued neither the Arctic Trawler nor its fishing

---

to "the value of the vessels." His view of the "buyout" was that it was designed simply to effect "a retirement of catch history from one sector that had vessels associated with it."

**15.** The Community Development Program created a set-aside for Alaskan native communities called the community development quota or CDQ. Remaining sector allocations (*e.g.*, to factory-trawlers, in-shore sector, etc.) are made after subtracting the CDQ and the bycatch limits from the total-allowable catch amount. That balance, distributed among the various sectors, is known as the directed pollack fishing allocation. According to Mr. Hughes, the native communities have "sold [their CDQ] every year to whoever would buy it for the most money."

**16.** As a part of this latter approach, Mr. Hughes assumed that the Arctic Trawler would be able to actualize its historical average (during the LLP qualifying period) catch per year of 11,700 metric tons. However, on cross-examination, he acknowledged that not all of the catcher processors eligible to fish under the AFA, in fact, are actively engaged in the BSAI pollack fishery "because it's more efficient not to have them fish."

In his expert report, Mr. Hughes presented a third valuation approach, this time valuing what the Arctic Trawler would have been worth had it

qualified to continue pollack fishing under section 208(e)(21) of the AFA. As noted, the Ocean Peace qualified under that provision and, according to the expert report, was allowed a pollack harvest of approximately 4500 metric tons. On cross-examination, however, Mr. Hughes admitted that he had made an error, and that the Ocean Peace had an allocation of closer to 2000 metric tons. Indeed, Mr. Hughes subsequently corrected his expert report, calculating the Ocean Peace's pollack take to be worth approximately $2 million. He conceded, though, that, had the Arctic Trawler qualified under that same AFA provision, both it and the Ocean Peace would have had to compete for the aforementioned 2000 metric tons of pollack.

**17.** Mr. Graves attributed between $600,000 and $1.5 million to the vessel itself, with the remaining sum being the value of the pollack quota "had it been able to fish under the AFA." At one point, Mr. Graves speculated that the value of the Arctic Trawler with its fishing rights might have been "in the neighborhood of $11 to $14 million." He explained, however, that all of his valuation approaches were premised on what the Arctic Trawler's pollack allocation would have been had it been included under various provisions of the AFA.

licenses or history at a point in time prior to the enactment of the AFA. While Mr. Graves attempted to broker the Arctic Trawler, he admitted that plaintiff never received an offer approaching its original, $4.5 million asking price. In fact, all of the offers had been "in the $2 million to $2.5 million range," inclusive of the vessel's fishing rights. Notwithstanding, Mr. Graves indicated that his actual experience in marketing the vessel played "[v]ery little" role in his expert opinion. Finally, in response to questioning by the court, Mr. Graves conceded that the $2 million actual contract price represented a "very fair [pre-AFA] market value" of the Arctic Trawler, including its associated fishing history and rights in existence under the previous regulatory regime. In terms of the post-AFA value of the Arctic Trawler, Mr. Graves, also in response to a question by the court, indicated that the $750,000 sales price was within the fair market value "range."

Defendant's expert, Mr. Jack McFarland, a marine surveyor, was retained by the government both to conduct a survey of the Arctic Trawler condition and to value the vessel before and after the passage of the AFA. He physically inspected the vessel over a two-day period in June 2000. In his opinion, the Arctic Trawler "was [in] between poor and average [physical] condition"—not surprising, in his view, as it is possibly "the oldest" vessel of its kind in the Alaskan fleet. Nonetheless, Mr. McFarland placed the fair market value of the Arctic Trawler, post-AFA, at $2.9 million, excluding from his assessment the value of the Arctic Trawler's catch history and fishing licenses. His estimation of the pre-AFA value of the Arctic Trawler was *lower*, in the range of $500,000

to $850,000. Mr. McFarland explained that the higher, post-AFA assessment was attributable to significant upgrades made to the vessel between 1998 and 2000.[18] He testified that, as of October 1998, based upon the documentary materials that he reviewed concerning the Arctic Trawler, the vessel was in no condition successfully to prosecute the pollack fishery. Indeed, he highlighted that the vessel "came back from Russia in poor condition and sat for...several years....[I]t takes quite a bit more to get a vessel up and operating after that time frame." Several of Mr. McFarland's key observations were confirmed by Mr. Joseph Doherty, president of Seafreeze Alaska.[19]

## II. DISCUSSION

In deceptively simple terms, the Takings Clause of the Fifth Amendment commands: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As recently explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Along these lines, Justice Holmes long ago opined that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393,

---

18. During cross-examination Mr. McFarland explained that, in its new configuration as a "head and gut" (H & G) trawler, the vessel is more versatile and thus able to target species of fish other than pollock. In 1998, by comparison, the versatility of the vessel was limited not only due to the fact that it was configured only to fish for pollock, but also because it had antiquated trawl and freezing systems.

19. Mr. Doherty, who was intimately involved with the vessel's purchase and renovations, testified that the Arctic Trawler was not mechanically fit to go fishing when Seafreeze Alaska took possession of it. He estimated that it cost "upwards of $500,000" to prepare the vessel to fish,

and that his company had spent "in excess of $1.5 million just in improvements." While Seafreeze Alaska still spends between $600,000 and $800,000 on maintenance costs for the vessel, which now primarily fishes for mackerel, cod, flathead sole, rock sole, Pacific Ocean perch, and yellowfin sole, the vessel was profitable in 2001, and, as of trial, was likely to be so in 2002, as well. As will be discussed in greater detail below, Mr. Doherty testified that the vessel has benefitted from the so-called "sideboard" provisions of the AFA (section 211), which set limits on how much other groundfish the pollack sector can take, "whereas there used to be no line between the two [sectors]."

415, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *see also Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448. This familiar language is the genesis of the so-called regulatory takings doctrine, first invoked to challenge mining and zoning laws, but here raised in contending that modifications made to the Federal program for managing fisheries effectuated a taking of plaintiff's property.

The Federal Circuit has developed a two-part test for evaluating such a takings claim.[20] Under the first prong of this test, the court must evaluate whether the claimant has a "property interest" that was affected by the government action. *Maritrans,* 342 F.3d at 1351; *Santa Fe Pacific R.R. Co. v. United States,* 294 F.3d 1336, 1344 (Fed.Cir. 2002); *see also Store Safe Redlands Assocs. v. United States,* 35 Fed.Cl. 726, 734 (1996). Frequently, this requires the court to sort among various, sometimes overlapping, claimed interests, some of which may be in the nature of property compensable under the Fifth Amendment and others of which not. *See, e.g., Maritrans,* 342 F.3d at 1352–53; *Conti v. United States,* 291 F.3d 1334, 1343 (Fed.Cir.2002); *Commonwealth Edison Co. v. United States,* 271 F.3d 1327, 1338–39 (Fed.Cir.2001). In this same vein, the court must sometimes ascertain which of several possessed interests were actually affected by the government action, that is, which was truly the property owned by the claimant that was arguably taken. *See Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1343 (Fed.Cir.2002); *Branch v. United States,* 69 F.3d 1571, 1575 (Fed.Cir.1995), *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996) ("In analyzing a takings claim, a court must first determine what was taken"); *Adams v. United States,* 2003 WL 22339164 at *5–10 (Fed.Cl.2003). Far from being doctrinaire, these antecedent inquiries are critical lest the court apply the right test to the wrong corpus, and yield seemingly valid, but ultimately misleading results. *See Cane Tennessee, Inc. v. United States,* 54 Fed.Cl.

100, 104 (2002) ("It is essential to determine the scope and nature of plaintiff's property interest to decide whether there has been a taking").

Having identified the property interest, if any, that is the subject of the alleged taking, the court must then determine whether there has, in fact, been a taking. *See Maritrans,* 342 F.3d at 1351; *M & J Coal,* 47 F.3d at 1154. A property owner may show that the government has effectuated a "categorical taking" by demonstrating that a regulation has denied the property owner of "all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Such is not the case here, but that does not end our inquiry. Rather, "[w]here a regulation places limitation on [property] that fall short of eliminating all economically beneficial use," the Supreme Court has stated, "a taking nonetheless may have occurred depending on a complex of factors." *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448; *see also Brown v. Legal Foundation of Washington,* 538 U.S. 216, 123 S.Ct. 1406, 1416, 155 L.Ed.2d 376 (2003) (noting that such cases require an "*ad hoc* factual inquiry"); *Tahoe–Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 335, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (must determine whether under "all the relevant circumstances" a taking is established). In 1978, the Supreme Court added some framework to this inquiry by identifying three criteria that are particularly significant in determining whether governmental action constitutes a taking: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646; *see also Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448.[21]

---

**20.** *See, Maritrans, Inc. v. United States,* 342 F.3d 1344, 1351 (Fed.Cir.2003); *Cienega Gardens v. United States,* 331 F.3d 1319, 1328 (Fed.Cir. 2003); *Chancellor Manor v. United States,* 331 F.3d 891, 901–02 (Fed.Cir.2003); *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir. 1995).

**21.** *See also Good v. United States,* 189 F.3d 1355, 1360 (Fed.Cir.1999), *cert. denied,* 529 U.S. 1053, 120 S.Ct. 1554, 146 L.Ed.2d 459 (2000); *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1179 (Fed.Cir.1994); *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1567 (Fed.Cir.1994);

The court will review the application of the *Penn Central* factors, and the evidence that relates thereto, but only after recapping its prior rulings defining the property interests that are at issue here.

### A. Cognizable property interest.

"The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment," the Federal Circuit recently instructed, "but rather defines the requisite property rights by reference to 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law." *Maritrans*, 342 F.3d at 1352 (quoting *Lucas*, 505 U.S. at 1030, 112 S.Ct. 2886); *see also Phillips v. Washington Legal Found.*, 524 U.S. 156, 163–64, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998). In the case *sub judice*, this court has already defined the property interest at issue in resolving the parties' cross-motions for summary judgment, holding that "[a]lthough plaintiff advances various property interests that were allegedly taken by the AFA, in the court's view, the *res* at issue here is the vessel itself, whose value was allegedly diminished by the passage of the AFA." *Arctic King Fisheries, Inc. v. United States*, Slip Op. No. 99–49 (April 30, 2003) (citing *American Pelagic Fishing Co., L.P. v. United States*, 49 Fed.Cl.

36, 46 (2001) (*American Pelagic I*)).[22] Denying defendant's motion for reconsideration, the court reaffirmed this ruling in its pretrial order, rejecting, yet again, defendant's reliance on *Conti v. United States*, 48 Fed.Cl. 532, 537 (2001), *aff'd*, 291 F.3d 1334, 1340, 1343 (Fed.Cir.2002), for the proposition that plaintiff had no protected property interest here. By way of distinction, the court reiterated that, unlike plaintiff here, the fisherman in *Conti* alleged in his complaint only the taking of a particular use of his vessel, *e.g.*, fishing for swordfish using gillnets, *Conti*, 48 Fed.Cl. at 537. In addition, it held "*Conti* does not preclude this court from hearing testimony on the value of the vessel's 'fishing history,' to the extent that the marketplace views such history as appurtenant to the vessel."[23]

The Federal Circuit's recent decision in *Maritrans, supra*, confirms the correctness of these rulings. In that case, owners of a tank barge fleet brought suit alleging that the Oil Pollution Act of 1990(OPA), Pub.L. No. 101–380, § 4115, 104 Stat. 484 (1990), by generally requiring that all tank vessels engaged in marine transportation of oil products be double-hulled, effectuated a regulatory taking of their single hull tank barges. Sweeping aside various arguments made by the parties as to what was and was not property,[24] the Federal Circuit held that the

---

*Creppel v. United States*, 41 F.3d 627, 631 (Fed. Cir.1994).

**22.** Subsequent to this ruling, Judge Bruggink issued a second opinion in *American Pelagic*, in which he held that the enactment of legislation retroactively revoking fishing permits issued to the owner of a fishing trawler effectuated a temporary taking of the trawler. *See American Pelagic Fishing Co., L.P. v. United States*, 55 Fed.Cl. 575 (2003) (*American Pelagic II*).

**23.** In these same rulings, the court rejected intervening-plaintiff's claim that plaintiff could not assert that the AFA effectuated a taking because it sold the vessel prior to the statute's effective date. The Supreme Court, indeed, has made clear that the mere enactment of a statute may effectuate a taking. *See, e.g., Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *see also Brubaker*

*Amusement Co., Inc. v. United States*, 304 F.3d 1349, 1358 (Fed.Cir.2002) (noting this in *obiter dicta*). Were the law otherwise, Congress could enact a confiscatory statute with an extended effective date and thereby minimize its takings liability as affected businesses were sold or liquidated before the statute took effect. While takings claims based upon the mere enactment of a statute face an "uphill battle," the analysis employed in testing such claims still centers on the *Penn Central* factors. *Keystone*, 480 U.S. at 495, 107 S.Ct. 1232; *see also Hodel*, 452 U.S. at 297, 101 S.Ct. 2352. Such an analysis is particularly apt here since the AFA, as enacted, left little to chance as to whether plaintiff would qualify for either a pollack allocation or a buyout—it could not.

**24.** For example, the court rejected the government's claim that because "Maritrans utilizes its single hull tank barges on the navigable waters of the United States, the property interest Maritrans asserts is the use of its vessels on such waterways, which . . . is not a protected property interest." 342 F.3d at 1352–53.

property interest affected by the OPA was "the basic property interest that Maritrans has in its single hull tank barges." 342 F.3d at 1353. The court noted that "Maritrans has various rights in its barges that qualify them as property for Fifth Amendment purposes," among them the right to "sell or otherwise or otherwise dispose of the barges," to "possess and transport them," or to "alter them by adding a second hull." *Id.* In so holding, the court drew the same analogy to *Conti* as this court had, opining that "Maritrans' interest in its tank barges is not unlike the interest that Paul Conti had in his swordfishing vessel ... and his swordfishing nets and gear." *Id.* The court further noted that "[w]e found that, while Mr. Conti's permit did not constitute a cognizable property interest under the Fifth Amendment, his boat, nets, and gear did." *Id.* (citing *Conti*, 291 F.3d at 1342–43). "In short," the court concluded, "Maritrans' property interest in its barges was not compromised by the nature of its claim." *Id.*

As in *Maritrans, American Pelagic* and other cases, the focus of the taking analysis here thus falls squarely on the vessel and its associated equipment. *See Armstrong*, 364 U.S. at 46–48, 80 S.Ct. 1563 (holding that interest in vessel was property that could give rise to a takings claim); *Osprey Pacific Corp. v. United States*, 41 Fed.Cl. 150, 154–55 (1998) (same). In reasserting this holding, however, it is important to emphasize what is *not* involved here in terms of property interests.

■ First, nothing in the record suggests that the fishing licenses and permits that plaintiff possessed were fundamentally different from the licenses and permits that have repeatedly been held not to constitute compensable property under the Fifth Amendment. As was said by this court in *American Pelagic I*, 49 Fed.Cl. at 46, "[l]icenses or permits are traditionally treated as not protected by the Takings Clause because they are created by the government and can be cancelled by the government and normally are not transferable." While, in part, such rulings are animated by concerns that the government not be required to pay compensation for value that it created, *see, e.g.,*

*United States v. Fuller*, 409 U.S. 488, 493, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973), the majority of decisions more simply concluded that the subject permits or licenses lacked one or more indicia of property—they were not freely transferable, could not be wielded to exclude others from the resource in question and could be modified or revoked by the granting agency. *See, e.g., Conti*, 291 F.3d at 1341 (swordfish fishing permit); *Alves v. United States*, 133 F.3d 1454, 1457 (Fed.Cir. 1998) (grazing preferences); *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 215–17 (Fed.Cir.1993) (firearm permit); *Page v. United States*, 51 Fed.Cl. 328, 339–40 (2001) (import permit); *Bradshaw v. United States*, 47 Fed.Cl. 549, 553 (2000) (grazing permit); *Hage v. United States*, 35 Fed.Cl. 147, 171 (1996) (grazing preferences). Like the licenses and permits in these cases, the fishing licenses and permits possessed by plaintiff were not freely transferable, could not be wielded to exclude others from the BSAI fishery, and could be modified or terminated by the relevant agencies virtually at will. They too, then, are not property.

But neither the rule involving licenses/permits nor its underlying rationale precludes consideration here of the fishing history of the Arctic Trawler, insofar as it is a constituent element of that which clearly is property—the vessel itself. *Per contra.* The Federal Circuit recently reiterated that the permit/license rule is "limited to those cases in which the interest does not inhere to some property that the plaintiff owns independently." *Cienega Gardens*, 331 F.3d at 1335; *see also United Nuclear Corp. v. United States*, 912 F.2d 1432, 1437 (Fed.Cir. 1990). As these cases teach, every stick in the bundle of property rights inherent in the ownership of the vessel should and must be considered in the takings analysis. That the fishing history, in some instances, can be sold separately does not alter this conclusion. Rather, as the Supreme Court only recently reemphasized in *Tahoe–Sierra*, the takings analysis requires consideration of the "parcel as a whole"—the " 'aggregate ... in its entirety,' " *Tahoe–Sierra*, 535 U.S. at 328, 122 S.Ct. 1465 (quoting *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979)); *see also Citizens Band*

of *Potawatomi Indians of Okl. v. United States*, 179 Ct.Cl. 473, 391 F.2d 614, 624 (1967). Under this concept, it is no more appropriate for the government to exclude from the takings analysis inherent features of the affected property that are more severely impacted by regulation than it is for a claimant to exclude those less so impacted.[25]

▌ That said, other property interests lurking in the depths of plaintiff's claims plainly are not cognizable, particularly those predicated upon benefits that plaintiff might have received under the AFA, but did not. Primarily through its experts, plaintiff asseverates, first, that, under the AFA, it was entitled either to a buyout of its vessel or some pollack allocation because it was similarly situated to the entities that received those benefits and, second, that it should be compensated for not having received those benefits. Approaching the takings issue in this elliptical fashion, however, runs aground on the practical fact that the AFA created no new property interests for plaintiff, either independently or as an inherent part of the vessel. Cases, indeed, are legion that hold that the bare receipt of benefits under a statute is not a property interest within the meaning of the Fifth Amendment. *See, e.g., United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 174, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) ("There is no claim here that Congress has taken property in violation of the Fifth Amendment, since railroad benefits, like social security benefits, are not contractual and may be altered or even eliminated at any time."); *Zucker v. United States*, 758 F.2d

637, 640 (Fed.Cir.1985) ("a 'government fostered expectation' that retirees will be provided retirement annuities which will not be ravaged by inflation ... does not rise to the level of 'property' protected by the takings clause"), *cert. denied*, 474 U.S. 842, 106 S.Ct. 129, 88 L.Ed.2d 105 (1985); *Mack v. United States*, 225 Ct.Cl. 187, 635 F.2d 828, 832 (1980) ("Plaintiff does not have a taking claim under the just compensation clause because the provisions of the Veterans' Preference Act cited by plaintiff ... that establish applicant eligibility lists do not create an interest in property subject to being taken for public use."), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981).[26] If Congress does not create property by establishing statutory obligations, *a fortiori* it does not do so by withholding them—whatever attributes of property absent in the former instance are all the more lacking in the latter.[27] Accordingly, to the extent that plaintiff directly claims that the AFA took its alleged entitlement to either a buyout or pollack allocation, it misses the mark entirely.

This should hardly seem a surprising proposition. To rule otherwise would be awkwardly to engraft equal protection considerations onto this takings case. But such a callus bridge between scion and stock will not take for several reasons. First, it would unduly expand the focus of the regulatory takings analysis from burdensome, but otherwise valid government actions, to whether the government acted arbitrarily in failing to confer a benefit. Consideration of the latter issue would collide with the well-established

---

25. The significance of including the fishing history, of course, depends, under the economic impact prong, on the extent the market itself considers the fishing history of a vessel in placing a value thereon, independent of its licenses and permits. In this regard, it is incumbent upon the claimant to show that the value of the property subject to regulation does not sweep in associated assets that do not constitute property. Thus, for example, if the value of a vessel and its fishing licenses were $2 million under one regulatory regime and $1 million after that regime were changed, the claimant would need to show the extent to which the lost value was attributed to that which is property it owned versus that which is not. In most cases, these complexities will wash out under the facts. As will be seen, that is the case here.

26. *See also Lynch v. United States*, 292 U.S. 571, 576–77, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); *Story v. Green*, 978 F.2d 60, 63 (2d Cir.1992); *Hoffman v. City of Warwick*, 909 F.2d 608, 616–17 (1st Cir.1990); *Jones v. Reagan*, 748 F.2d 1331, 1338–39 (9th Cir.1984); *Adams*, 2003 WL 22339164 at *6–*7.

27. Care in this regard must be exercised not to analogize what is "property" for purposes of the Taking Clause and what might be viewed as a "property interest" under the Due Process Clause, as the two concepts are dissimilar. *See Flemming v. Nestor*, 363 U.S. 603, 610–11, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *Kizas v. Webster*, 707 F.2d 524, 538–40 (D.C.Cir.1983).

principle that the action giving rise to a taking must be valid. *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); *First English Evangelical Lutheran Church v. Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (taking clause "is designed ... to secure compensation in the event of otherwise proper interference amounting to taking").[28] Second, as the tenor of plaintiff's arguments amply illustrate, its hybrid approach begs the court essentially to determine whether Congress' decision not to confer a particular benefit rationally furthered a legitimate state interest. *See, e.g., Nordlinger v. Hahn*, 505 U.S. 1, 11–12, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).[29] The latter consideration, while central in equal protection cases, is, at best, peripheral to the question whether property has been "take[n]" under the Takings Clause.[30] Finally, adopting plaintiff's approach ironically could lead to its receiving relief under the Takings Clause that would be unobtainable under the Equal Protection Clause. In the latter context, plaintiff would have to show, by reference to severability clauses and other indications of legislative intent, that the proper way to remedy an arbitrary distinction would be to extend, rather than nullify, the

benefit conferred by Congress under the AFA. *See, e.g., Davis v. Michigan Dept. of the Treasury*, 489 U.S. 803, 817–18, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984). Here, plaintiff simply leaps to the conclusion that, in the guise of just compensation, it is entitled to benefits that Congress plainly chose not to confer.

For these and other reasons to be discussed below, the court believes that it is largely inconsequential what plaintiff would have received had it been included in either the AFA's buyout provision or pollack allocation. Rather, the core issue here is whether the AFA's exclusion of plaintiff from the BSAI pollack fishery effectuated a taking of the Arctic Trawler and property interests appurtenant thereto. To that issue, the court now returns.

## B. Regulatory taking factors.

We must determine whether the particular facts of this case, as anchored in the trial record, constitute a taking under the three-part *Penn Central* test. As will be seen, the foregoing discussion regarding the nature of the property interests involved—and not in-

---

28. *See also* Paul J. Boudreaux, *The Quintessential Best Case for "Takings" Compensation—A Pragmatic Approach to Identifying the Elements of Land–Use Regulations that Present the Best Case for Government Compensation*, 34 San Diego L.Rev. 193, 218 (1997) (contrasting the takings and equal protection analyses in this regard); for articles distinguishing between the takings and due process analyses, *see generally,* Steven J. Eagle, *Substantive Due Process and Regulatory Takings: A Reappraisal,* 51 Ala. L.Rev. 977 (2000); John D. Echeverria & Sharon Dennis, *The Takings Issue and the Due Process Clause: A Way Out of a Doctrinal Confusion,* 17 Vt. L.Rev. 695 (1993).

29. As summarized in *Nordlinger*—

[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered true by the government decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

505 U.S. at 11–12, 112 S.Ct. 2326 (citations omitted); *see also Allied Stores of Ohio, Inc. v.*

*Bowers,* 358 U.S. 522, 527, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959).

30. *See Lucas,* 505 U.S. at 1027 n. 14, 112 S.Ct. 2886 (rejecting the notion that "the Takings Clause [is] little more than a particularized restatement of the Equal Protection Clause"); *Nollan v. California Coastal Com'n,* 483 U.S. 825, 834 n. 3, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) ("[O]ur opinions do not establish that [the standards applied to takings claims] are the same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have been quite different."). While the arbitrariness of a statutory or regulatory distinction might bear on the nature of the governmental action under the *Penn Central* analysis, indicating, for example, that a particular claimant has been singled out, that inquiry is not performed with the varying degrees of deference and assumptions of validity characteristic of the equal protection analysis. *See Nollan,* 483 U.S. at 835 n. 3, 107 S.Ct. 3141; *see also* Charles M. Haar & Michael Allan Wolf, *Euclid Lives: The Survival of Progressive Jurisprudence,* 115 Harv. L.Rev. 2158, 2185–86 (2002); Jan G. Laitos, *Takings and Causation,* 5 Wm. & Mary Bill Rts. 359, 393–96 (1997).

volved—here considerably facilitates this discussion.

### 1. Economic impact.

The first criterion—the economic impact of the regulation—is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor*, 28 F.3d at 1176; *see also Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). The cynosure of this factor is the change in the fair market value of the subject property caused by the regulatory imposition—in other words, the court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous*, 480 U.S. at 497, 107 S.Ct. 1232; *see also Penn Central*, 438 U.S. at 130–31, 98 S.Ct. 2646; *Florida Rock*, 18 F.3d at 1567. "The economic analysis," this court has noted, "is often expressed in the form of a fraction, the numerator of which is the value of the subject property encumbered by regulation and the denominator of which is the value of the same property not so encumbered." *Walcek v. United States*, 49 Fed.Cl. 248, 258 (2001), *aff'd*, 303 F.3d 1349 (Fed.Cir.2002); *see also Florida Rock*, 18 F.3d at 1567; *Brace v. United States*, 51 Fed.Cl. 649, 653 (2002).

Having defined the subject property whose value, in two variations, is to be captured in this economic analysis fraction, the court must next place values on the numerator and denominator of that fraction. For that purpose, one would expect the expert testimony and reports introduced at trial to be instructive. But, the bulk of the expert evidence floated by plaintiff on this issue sinks of its own weight, either stubbornly valuing the wrong asset by focusing on plaintiff's fishing licenses or the benefits it alleged it should have received under the AFA, or by valuing the vessel and its equipment by extrapolating from the value of benefits that were conferred on other parties by the AFA. Both approaches ultimately do not hold water—

the former does not value "property" that plaintiff possessed, while the latter adopts a frame of reference that has nothing to do with the fair market value of the assets in question.

A few words of elaboration on the latter point are warranted. In valuing the vessel and its equipment by reference to benefits that were conferred by the AFA on owners of allegedly similarly-situated vessels, plaintiff's experts significantly deviated from fundamental fair market value principles. Under those principles, "fair market value" is generally calibrated not to what Congress paid someone else for an asset or should have similarly paid the claimant. Rather, such value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *see also Yancey v. United States*, 915 F.2d 1534, 1542 (Fed.Cir.1990); *Washington Metropolitan Area Transit Authority v. United States*, 54 Fed.Cl. 20, 27 (2002). Nothing in the evidentiary record here suggests that prior to the passage of the AFA or thereafter, a willing and reasonably knowledgeable buyer would have purchased the Arctic Trawler for an amount remotely comparable to those calculated by plaintiff's experts by reference to the AFA's pollack allocation and buyout provisions. Likewise, there is no indication that Congress had fair market value principles in mind when it placed dollar figures on the benefits conferred by the AFA, so as to allow those figures to be viewed as a proxy for fair market value. Logic and the facts suggest otherwise: for example, under the buyout provision, Congress allocated the same amount—$10 million—to each of nine different vessels, despite the fact that these ships had significantly different capacities and catch histories. The record, indeed, reveals that the $90 million figure had little or nothing to do with the value of the vessels, but rather represented a lump-sum payment to a small group of owners that possessed all nine vessels in exchange for retiring the fishing

rights of those vessels.[31] Arguing, as plaintiff has, that the figure used in the AFA means that plaintiff too is entitled to $10 million is an utter *non sequitur* and no substitute for reliable proof of the fair market value of plaintiff's vessel.[32]

■ To be sure, for takings purposes, a property owner is entitled to have the fair market value be based upon the "highest and best use" of its property. *See, e.g., Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). And "highest and best use" has been defined as " '[t]he reasonably probable and legal use of [property], which is physically possible, appropriately supported, financially feasible, and that results in the highest value,' " including those uses to which the property " 'may be readily converted.' " *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 156 (1990) (quoting *United States v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943)); *see also Bassett, New Mexico, LLC v. United States,* 55 Fed.Cl. 63, 69 (2002). Yet, none of these cases, even with a hospitable scope, require the court to indulge in "what if" fictions of the sort plaintiff offers up here. Contrary to its importunings, the loss to be compensated for under the Takings Clause is not purely hypothetical, but must bear some grounding in reality, even in the case of a projected future use. The language of the Clause thus no more envisions a taking of "private property" the plaintiff does not own, than it does the payment of just "compensation" for the loss of value that plaintiff never had nor reasonably could realize. That is why, in defining "highest and best" use, the Supreme Court has emphasized that "[a]s its name suggests, . . . just compensation is, like ordinary money damages, a compensatory

remedy," *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 710, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) further adumbrating that the question "is what the owner lost, not what the taker gained," *Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725 (1910), and that the claimant "must be made whole but is not entitled to more," *Olson,* 292 U.S. at 255, 54 S.Ct. 704.[33] And it is also why plaintiff here, despite its claims of entitlement, cannot receive more in compensation on account of the passage of the AFA than it would have if the statute had never passed.

So what is the value of the vessel and the associated property interests in question? In terms of plaintiff's evidence, the most tempting indicia of the pre- and post-AFA value of the Arctic Trawler is the August 20, 1998, purchase and sale agreements for the vessel, which, after passage of the AFA, was finalized by an amendment adopted on October 28, 1998. Under this agreement, the pre-AFA price of the vessel was set at $2 million, while the post-AFA price dropped to $750,000. Regarding this sale, one of plaintiff's experts, Steven Hughes, opined—

> The reduction in the sale price of the F/T Arctic Trawler from $2.0 million in August 1998 (before the AFA) to $750,000 in October 1998 (after the AFA) was caused, in my opinion, by loss of this vessel's ability to pursue the most valued fishery that was available to it—Alaska pollack. More specifically, the F/T Arctic Trawler sale value diminished because the AFA limited the F/T Arctic Trawler's revenue producing capabilities and because the number of competitive potential buyers was reduced.

**31.** By way of further evidence of this: one of the vessels identified in the buyout, the Brown's Point, sold for $2.5 million only a few days before being included in the legislation.

**32.** Specifically, it appears that the $90 million figure was calculated by determining what it would cost to move the ten percent of the pollack take represented by these vessels' catch history to other sectors of the fishery.

**33.** *See also Brown,* 123 S.Ct. at 1419–20. A similar leitmotif runs through the many cases holding that a property owner should not receive

compensation on account of an enhanced property value produced by the government action that gave rise to the alleged taking. *See, e.g., United States v. Reynolds,* 397 U.S. 14, 16–18, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); *United States v. Chandler–Dunbar Water Power Co.,* 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) ("The value should be fixed as of the date of the proceedings, and with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken, and not as enhanced by the purpose for which it was taken.").

As noted by various courts, "[a]n actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good." *Keener v. Exxon, Co., USA*, 32 F.3d 127, 132 (4th Cir.1994); *see also Sleiman v. Comm'r*, 187 F.3d 1352, 1360–61 (11th Cir.1999); *G.M. Trading Corp. v. Comm'r*, 121 F.3d 977, 983 (5th Cir.1997) (noting that this rule "reflects the common sense notion that an asset's value is the price persons are willing to pay for it"). That rule, as defendant admits, obviously applies to the post-AFA sale price, which the court, therefore, finds represents the fair market value of the vessel at that time.

The evidentiary waters, however, are considerably murkier with respect to the pre-AFA value of the vessel. To be sure, the original purchase and sale agreement for the Arctic Trawler, was more than a bare offer or option and, therefore, is relevant in determining the value of the vessel.[34] How relevant, though, is another matter. In assessing the weight of an unconsummated agreement, the case law focuses on what, if any, preconditions there were to the completion of the transaction. To the extent these contingencies are considerable and reserve control in the purchaser, an agreement is more likely to be viewed like an option, with concomitantly reduced evidentiary weight. If, instead, such conditions are controlled by the seller or by some third party, or otherwise hinge on events beyond the purchaser's control, an agreement more likely will be categorized as the sort of binding agreement that provides an accurate barometer of value. *See United States v. 428.02 Acres of Land*, 687 F.2d 266, 271 (8th Cir.1982);

*United States v. Smith*, 355 F.2d 807, 812 (5th Cir.1966); *Illinois Central R.R. Co. v. 16.032 Acres of Land*, 1999 WL 1138497 (E.D.La.1999); *see also City of Phoenix v. Clauss*, 177 Ariz. 566, 869 P.2d 1219, 1223–24 (App.Div.1994) (cataloguing similar federal and state cases).

A review of the contract *sub judice* reveals that the obligation of the parties were subject to significant contingencies controlled by Trinity. Thus, the agreement provided that "[p]urchaser's obligation to purchase the Vessel is subject to the completion of inspections of the Vessel by Purchaser, which, in Purchaser's sole opinion, is satisfactory to Purchaser." In addition, the agreement caveated that "[p]urchaser's obligation to purchase the Vessel is subject to Purchaser obtaining financing satisfactory to it within forty-five (45) days from the date of this agreement." The latter condition proved pivotal, as the President of Seafreeze Alaska, Mr. Doherty, testified that he was unable to obtain financing at the original sales price of $2 million. This failure, in turn, triggered a series of events that ultimately led to the renegotiation of the purchase price to conform to an amount that Mr. Doherty testified was all the cash that he and his partners could raise.[35] While these circumstances cast doubt on plaintiff's claim that the renegotiated purchase price was prompted by the passage of the AFA, they suggest, more immediately, that the $2 million purchase price specified in the original purchase and sale agreement represents a poor indicia of the fair market value of the Arctic Trawler prior to the passage of the AFA.[36]

---

**34.** *See, e.g., Wolff v. Puerto Rico*, 341 F.2d 945, 947 (1st Cir.1965); *United States v. Certain Parcels of Land in the City of Philadelphia*, 144 F.2d 626, 629–30 (3d Cir.1944); *cf. Sharp v. United States*, 191 U.S. 341, 348, 24 S.Ct. 114, 48 L.Ed. 211 (1903); *Ballard v. El Dorado Tire Co.*, 512 F.2d 901, 908 (5th Cir.1975); *see generally*, Vitalis M. Gulbis, Annotation, *Unaccepted Offer for Purchase of Real Property as Evidence of its Value*, 25 A.L.R.4th 571, 1983 WL 190862 (1983); Vitalis M. Gulbis, Annotation, *Unaccepted Offer to Sell or Listing of Real Property as Evidence of its Value*, 25 A.L.R.4th 983, 1983 WL 190866 (1983).

**35.** In this regard, Mr. Doherty testified that he and his partners developed three options: (i) a cash offer of $750,000; (ii) a total offer in excess of $750,000, but with only $500,000 in cash and the rest as a note; and (iii) a total offer in excess of the second offer, but with a smaller down payment and a still greater note amount. According to Mr. Doherty, Arctic King declined to finance any portion of the sales price, which led Seafreeze to proceed with the $750,000 cash offer. Mr. Doherty indicated that had Arctic King been willing to finance the original $2 million purchase price, Seafreeze "probably" would have proceeded with the original contract.

**36.** Indeed, the unconsummated purchase and

Other evidence in the record, indeed, suggests that the value of the Arctic Trawler was significantly lower than the original $2 million purchase price. For one thing, that price reflected the value of the vessel, its fishing history *and* its fishing rights. Regarding the relative value of the vessel and its fishing rights, Ronald Graves, one of plaintiff's experts, indicated that had the Arctic Trawler been able to fish under the AFA, it would have been worth between $6 and $8 million. But, he attributed only between $600,000 and $1.5 million to the vessel itself, allocating the remainder of his figure to what he estimated would have been the vessel's pollack quota under the AFA.[37] In discussing the limited value of the vessel, Mr. Graves noted that the Arctic Trawler had a complex and antiquated DC diesel electric system that was expensive to maintain and for which it was hard to find parts. Consistent with these views, defendant's expert, Mr. Jack McFarland, set the pre-AFA value of the Arctic Trawler at between $500,000 to $850,000. In support of his estimate, Mr. McFarland noted that the vessel was one of the oldest in the Alaska fleet and had re-

turned from Russia in poor condition and unable to prosecute the pollack fishery; its condition worsened as the vessel sat moored for over a year, while sale negotiations occurred.[38] These observations were confirmed by Mr. Doherty, the president of Seafreeze Alaska, who estimated that it cost his firm upwards of $500,0000 to prepare the vessel to fish. He indicated that Seafreeze eventually made in excess of $1.5 million in improvements to the vessel (in addition to $600,000 to $800,000 in regular maintenance), a factor that Mr. McFarland, in turn, cited in setting the post-AFA value of the vessel in 2000 at $2.9 million.

Based on the foregoing evidence, the court finds that the pre-AFA value of the Arctic Trawler was no more than $1.5 million, and likely considerably less. As such, the court finds that the numerator of the takings equation is equal to $750,000 and that the denominator thereof is, at most, $1.5 million. Consequently, the court finds that the enactment of the AFA, which prevented the Arctic Trawler from participating in the BSAI pollack fishery, resulted in a diminution in value of, at most, approximately 50 percent.[39]

sale agreement with Seafreeze was one of several agreements entered into by plaintiff in which the purchaser withdrew based upon the triggering of a contingency. In one case, the agreement was terminated based on perceived problems with the ship's engines (which were remedied before the sale to Seafreeze), while in at least two others, the contingency apparently involved the purchaser's inability to obtain financing.

37. In reaching this estimate of the vessel's value, Mr. Graves viewed one vessel, the Resolute, as being particularly comparable to the Arctic Trawler. In June of 1999, the Resolute was sold for $1.2 million.

38. Commenting on a number of photographs he had taken of the Arctic Trawler during the inspection, Mr. McFarland pointed out various areas where the vessel was plainly damaged and rusting. In his opinion, the Arctic Trawler's deterioration was an indication that it had "been some time since there [had] been yard work on the vessel." He also noted evidence of "poor maintenance habits" and repairs that had not been completed "in a timely manner." In his view, the damage and deterioration likely occurred over a period "of at least two years." Finally, it was his opinion that the vessel, in 1998, was not in "operational condition"—it could not have been "just thrown into service

and taken to the Bering Sea" to fish. Joseph Doherty, president of Seafreeze Alaska, testified much the same.

39. In assessing the severity of the economic impact of the regulations, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored," thereby requiring the court, if possible, to compare "the relationship of the owner's basis or investment" in the property before the alleged taking to the fair market value of the property after the alleged taking. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *see also Walcek*, 49 Fed.Cl. at 266. Subsequent cases suggest that while a property's owners ability to recoup its investment is indicative that a regulation has not effectuated a taking, *see, e.g., Walcek*, 49 Fed.Cl. at 266–67, the converse is not necessarily true as it always possible that the owner's inability to recoup its investment is attributable to factors unrelated to the regulation. *See Cane Tennessee*, 57 Fed.Cl. at 123. At all events, there is insufficient evidence on this record to determine whether plaintiff recouped its investment—specifically, it is unclear how much plaintiff initially paid to acquire the Arctic Trawler (mortgage documents in the record do not indicate whether the vessel was the only asset being acquired with the mortgage proceeds) and the extent to which plaintiff augment-

### 2. The extent to which the regulation has interfered with reasonable investment-backed expectations.

■ The second factor in *Penn Central*— the interference with reasonable investment-backed expectations—is a "way of limiting takings recoveries to owners who [can] demonstrate ... reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor*, 28 F.3d at 1177; *see also Creppel*, 41 F.3d at 632. Although this factor is often couched in terms of the owners expectations at the time the property is purchased, *see Loveladies Harbor*, 28 F.3d at 1177, various cases hold that the inquiry focuses on various investment decisions, including those made after the property was initially purchased. *See, e.g., Good*, 189 F.3d at 1361–62; *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184, 1193 (1981) *Seldovia Native Ass'n, Inc. v. United States*, 35 Fed.Cl. 761, 773–74 (1996).[40] So framed, this factor encompasses two related elements: first, the extent of the plaintiffs' investment in reliance on the regulatory scheme in place at the time of his investment decisions; and second, the extent to which the further regulation of its property was foreseeable. *See, e.g., Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1006, 1013, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *see also Walcek*, 49 Fed.Cl. at 268. These expectations must be reasonable—"[a] 'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005–06, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)); *see also Cienega*

*Gardens*, 331 F.3d at 1345–46; *Good*, 189 F.3d at 1360.

As it has in other cases, defendant flatly argues that plaintiff operated in a heavily regulated industry and could not reasonably expect to continue its participation in the BSAI pollack fishery indefinitely. To be sure, as Justice O'Connor noted in her concurring opinion in *Palazzolo*, "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of [the claimant's] expectations." 533 U.S. at 633, 121 S.Ct. 2448; *see also Chancellor Manor*, 331 F.3d at 906; *Cane Tennessee*, 57 Fed.Cl. at 126. Moreover, the Supreme Court has insisted, regarding the subsequent modification of such a regulatory regime, that "'[t]hose who do business in [a] regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Concrete Pipe & Prods., Inc., v. Construction Laborers Pension Trust*, 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (quoting *Federal Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958)); *see also Commonwealth Edison*, 271 F.3d at 1348–49; *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1350 (Fed.Cir.2001). And, of course, the Court has long held that "[n]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit." *New York Central R.R. v. White*, 243 U.S. 188, 198, 37 S.Ct. 247, 61 L.Ed. 667 (1917); *see also Pennsylvania Coal Co.*, 260 U.S. at 413, 43 S.Ct. 158; *Branch*, 69 F.3d at 1578.

---

ed or recouped its investment over the life of its ownership. As such, the court is no position to apply reliably this mode of analysis.

**40.** As noted by Professor Eagle, in his treatise on regulatory takings—

The phrase "investment-backed expectations" had been used first in Professor Frank Michelman's seminal article and borrowed for Justice Brennan's *Penn Central* opinion with no reference other than to the intent, or expectation, of the landowner at the time he made his "investment." *Good* suggests that subsequent events, including the alacrity with which the owner pursues his plans, the extent the owner has to battle administrative delay in a multitude of

agencies, and the enactment of subsequent statutes and the promulgation of regulations, all play a role in "reasonable investment-backed expectations" analysis.

Steven J. Eagle, Regulatory Takings 931 (2001) (citing, *inter alia*, Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv. L.Rev. 1165 (1967)). Application of this rule makes particular sense in the case *sub judice* where, as will be seen, plaintiff, subsequent to its purchase, made critical investment decisions that it reasonably should have known would increase the likelihood that it would eventually be excluded from the pollack fishery if a decapitalization occurred.

Yet, individuals operating in highly regulated fields do not forfeit their rights under the Fifth Amendment to the whim of whatever regulation the winds may bring—"[t]he mere fact of regulation ... does not signify that an investor can never form a reasonable expectation of a return on his investment." *American Pelagic I,* 49 Fed.Cl. at 49; *see also District Intown Properties, L.P. v. District of Columbia,* 198 F.3d 874, 886–87 (D.C.Cir.1999), *cert. denied,* 531 U.S. 812, 121 S.Ct. 34, 148 L.Ed.2d 14 (2000) (Williams, J. concurring). Rather, as the Federal Circuit recently underscored, the question is whether the changes in a given regulatory regime were reasonably foreseeable—

A business that operates in a heavily-regulated industry should reasonably expect certain types of regulatory changes that may affect the value of its investments. But that does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever.

*Cienega Gardens,* 331 F.3d at 1350 (emphasis in original); *see also Chancellor Manor,* 331 F.3d at 906; *cf. Folden v. United States,* 56 Fed.Cl. 43, 61 (2003). That court thus distinguished between "legislation that merely clarified the originally-intended meaning of an existing statute" or reasonably extended a regulatory regime established by an earlier statute and "legislative amendments that fundamentally *changed* the scheme legislated previously." *Cienega Gardens,* 331 F.3d at 1351 (emphasis in original); *see also Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 214, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *United Nuclear,* 912 F.2d at 1436 (fact that claimant agreed that leases with Secretary of Interior would be subject to future regulations does not, for purposes of determining reasonable investment-backed expectations, mean that claimant could rea-

sonably be expected to anticipate entirely new policy).

So did the AFA change the regulatory regime here in a fundamental way that was not reasonably foreseeable? It appears not. First, it was eminently foreseeable that Congress would eventually take steps to remedy the overcapitalization of the BSAI pollack fishery. The record reveals that the problem of overcapitalization in the BSAI pollack fishery was long-standing and well known in the fishing industry. As noted by one of plaintiff's experts, Mr. Hughes, beginning in the latter half of the 1980s, around the time plaintiff purchased the Arctic Trawler, "[t]here was a lot of concern in the industry that this capacity that was coming in was going to be far, far in excess of what was needed to efficiently harvest the resource, so there was concern about overcapitalization in the fishery." And, at least by 1988, the fishing industry had begun urging government agencies to remedy this problem.[41] Moreover, plaintiff was painfully aware of this growing problem, which, by all accounts, eventually drove it to shift its operations to Russia in 1995. Moreover, there was clear indication to all involved that Congress and the NMFS recognized the problem and would eventually tackle it. Regulations implementing both the VMP and LLP made note of this in indicating that they constituted only interim relief, with a more fundamental recapitalization of the BSAI pollack fishery to come. Concerned with the pace and obvious limitations of these administrative approaches, industry members eventually prevailed upon Congress to act.

When the decapitalization of the BSAI pollack fishery finally occurred in the form of the AFA, a familiar tack was used to decide who would continue to participate in the fishery, by focusing on the recent catch history of the vessels involved. The record reveals that this approach has often been used as a basis for limiting entry into fisheries under various regulatory regimes.[42] Such was the

41. Regarding this problem, Mr. Hughes further testified—

The industry had been requesting the North Pacific Fishery Management Council and the National Marine Fishery Service for many years to have what we called a comprehensive-rationalization program put in place ... The

reason the industry wanted this program was so that vessel operations could be more efficient and better managed ... [It] was a matter of providing a more efficient operation.

42. As noted by Mr. Hughes, "every limited-entry system that has been put into the North Pacific, Alaska groundfish fisheries, and even the crab

case, for example, with respect to the VMP and LLP, both of which determined continuing eligibility based upon qualifying catch history in the qualifying years identified in the regulation. *See, e.g.,* Fisheries of the Exclusive Economic Zone off Alaska, 63 Fed. Reg. 52,642, 52,643 (Oct. 1, 1998) (LLP); Limited Access Management of Federal Fisheries in and off Alaska, 60 Fed.Reg. 40,763, 40,764 (1995) (VMP). That same approach was employed in the AFA—with the 29 vessels listed in sections 207 and 208(e)(21) all having conducted active pollack fishing in 1997 and 1998. That Congress chose to refer to these vessels by name, rather than by qualification, is of no moment, particularly given the catch-all provision in section 208(e)(21), under which any vessel could qualify for an allocation of the pollack if it had more than 2,000 metric tons of catch in 1997. While plaintiff obviously could not anticipate the exact period that Congress would use to qualify vessels for continued participation in the pollack fishery, it was reasonably foreseeable that Congress would employ this general approach and use a period that reflected recent participation in the fishery. As such, plaintiff assumed the economic risk that it would be locked out of the fishery not only when it chose to fish in Russian waters, but also when, for a period of almost 14 months after the vessel returned from Russia, it left the vessel moored and inactive. As a result of these actions, the Arctic Trawler had no domestic catch for a period of more than three years. Plaintiff gambled that this period of inactivity would not effect its eligibility to fish for pollack—and it lost.

Given these circumstances, plaintiff cannot have had reasonable-investment backed ex-

pectations that, despite what it knew and the actions it took notwithstanding, it would be insulated from or insured against any decapitalization of the fishery. To the contrary, the AFA merely effectuated the reasonably foreseeable decapitalization of the BSAI pollack fishery and did so in a reasonably foreseeable fashion. *See Avenal v. United States,* 100 F.3d 933, 937–38 (Fed.Cir.1996).[43] The arguments made by plaintiff do not persuade us otherwise. For example, it complains that Congress should have selected a different qualifying period—predictably, a longer one, under which plaintiff would have qualified. But, again, what Congress should have done is largely irrelevant here for this is no equal protection case. And, even if it were, it plainly was not irrational for Congress to select a qualifying period that excluded vessels which, like the Arctic Trawler, did not have recent catch history. Also unavailing is plaintiff's claim that various key features of the AFA were unforeseeable—for example, that the buyout program was mandatory, despite indications in the Magnuson–Stevens Act that such fishing capacity reduction programs would be voluntary, *see* 16 U.S.C. § 1861a(b)(3) (1998). These assertions are red herring. To repeat—the critical issue is not whether other vessels were treated in a fashion fundamentally inconsistent with the previous regulatory regimes, but rather whether plaintiff was. And, of this, there is no indication. In sum, the court finds that plaintiff did not have a reasonable investment-backed expectation that, even with the Arctic Trawler's three-year hiatus from the BSAI pollack fishery, its prior fishing history would be sufficient to protect it

---

fisheries and the halibut and black cod IFQ fisheries, major decisions have been based on an individual's catch history in terms of how that vessel qualifies and just what they qualify for. It's all based on catch history." Another witness, Mr. Dunnigan, indicated that this approach was employed to "reserve the benefits of this fishery for the people who've actually been participating in it."

**43.** In *Avenal,* the Federal Circuit found that oyster harvesters were on notice that their livelihood might be destroyed if plan to alter the salinity of parts of the Mississippi River were implemented. 100 F.3d at 938. The court observed that the

leaseholders of the oyster beds thus had no reasonable expectation of continuing indefinitely their oyster production, since the plans to engage in freshwater diversion were in the formative stage when their leases were executed. In light of these plans, the court held that the leaseholders "knew or should have known" that their beds might be destroyed. *Id.* at 937. As such, the court concluded that "these plaintiffs in the words of *Penn Central* cannot have had reasonable investment-based expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments." *Id.*

when the long-anticipated plan to decapitalize that fishery finally was adopted by Congress.

### 3. The character of the governmental action.

The last criterion—the character of the government action—requires the court to take soundings regarding "the purpose and importance of the public interest underlying [the] regulatory imposition, ... obligating the court to 'inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.'" *Maritrans,* 342 F.3d at 1356 (quoting *Creppel,* 41 F.3d at 631); *see also Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886 (no taking if the limitation "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership."); *Forest Props., Inc. v. United States,* 177 F.3d 1360, 1366 (Fed.Cir.1999); *Loveladies Harbor,* 28 F.3d at 1179. "[W]hile most burdens consequent upon government action undertaken in the public interest must be borne by individual landowners as concomitants of the advantage of living and doing business in a civilized community," the Supreme Court has stated, "some are so substantial and unforeseeable, and can so easily be identified and redistributed, that justice and fairness require that they be borne by the public as a whole." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 14, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (citation omitted).[44] Burnishing this concept, the Supreme Court, in *Eastern Enterprises,* suggested that in considering whether, under this factor, a regulation "implicates [the] fundamental principles of fairness underlying the Takings Clause," two other indicia are relevant: (i) the extent to which the action is retroactive; and (ii) whether the action targets a particular individual. *Eastern Enter-*

*prises,* 524 U.S. at 537, 118 S.Ct. 2131; *see also American Pelagic I,* 49 Fed.Cl. at 50.

In the case *sub judice,* there is neither evidence that fishing, in general, nor plaintiff's conduct in prosecuting the BSAI pollack fishery, in particular, constituted a nuisance, so that the passage of the AFA could be viewed as effectuating a limitation already inherent in the use of the vessel. *See American Pelagic I,* 49 Fed.Cl. at 47 ("We are not confronted here with a property or a use which is inherently dangerous or a nuisance. There is nothing in the nature of a fishing vessel that suggests that any use is totally a matter of governmental grace."). But, it is also beyond peradventure that the AFA, in addressing the long-standing problem of overcapitalization of the BSAI pollack fishery, legitimately served an important public purpose—one which bettered not only the public at large by efficiently managing an important natural resource, but particularly boosted the long-suffering fishing industry, including plaintiff and the intervening-plaintiff, the successor owner of the Arctic Trawler. Proof of this lies not only in the legislative history of the AFA, but also in an abundance of statements in the record. *See also Maine v. Taylor,* 477 U.S. 131, 151, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (noting the legitimate government interest in protecting fisheries and the fishing industry). The record evidence particularly demonstrates that the statute addressed the problem of overcapitalization in the only way it could be addressed, namely, by prospectively reducing the number of domestic vessels competing for pollack in the fishery. Thus, without exception, all the experts who testified generally agreed that without such a reduction—which could be accomplished only by a statutory change—no effective rationalization of the pollack fishery could occur.

---

44. *See also United States v. Locke,* 471 U.S. 84, 106 n. 15, 105 S.Ct. 1785, 85 L.Ed.2d 64; *Maritrans,* 342 F.3d at 1357; *Cienega Gardens,* 331 F.3d at 1338; *American Pelagic I,* 49 Fed.Cl. at 51. In *Maritrans,* the Federal Circuit determined that the nature of the government's action in passing legislation that would require oil tankers to have double hulls, in the wake of the Exxon Valdez oil spill and as an attempt to limit

such spills in the future, was not such that it imposed disproportionately a burden on the plaintiff. The legislation applied uniformly across the oil transport industry, "thereby spreading the burden imposed by the statute over the entire industry" and, therefore, did not rise to a taking of plaintiff's property. 342 F.3d at 1357.

At first blush, one might conclude that there were obvious winners and losers under the decapitalization regime adopted by the AFA, with plaintiff numbering among the also-rans. But, the slightest examination of the evidentiary record here demonstrates otherwise. For one thing, the burden of the legislative change was spread across a wide sector of the pollack fishing industry and was not home solely by plaintiff or those situated similarly to it—on the one hand, vessels with considerably greater catch histories than the Arctic Trawler were excluded from the fishery, while, on the other, those given pollack allocations were subject to significant limitations on their other fishing activities. In this and other ways, the rationalization affected by the AFA increased the efficiency of every boat, including those that were excluded from the pollack fishery. While that rationalization could only be accomplished by excluding vessels without recent catch history, the AFA broadened the opportunities for such vessels to participate in other BSAI groundfish fisheries (e.g., atka mackerel, yellowfin sole, rock sole, Pacific cod and Pacific ocean perch) by eliminating nine large vessels and, under section 211 of the AFA, reducing the "sideboard" catches of the other groundfish for the remaining AFA pollack catchers and catcher/processors.[45] These provisions were not empty promises: at trial, it was shown that the total catch for nonpollack vessels in other groundfish fisheries has substantially increased after the AFA and that the reconfigured Arctic Trawler, now known as the Seafreeze Alaska, has been a profitable member of that market. Such considerations plainly are relevant in assessing whether a taking occurred here. See Penn Central, 438 U.S. at 137, 98 S.Ct. 2646 (holding that plaintiff's ability to recoup lost profits through transferred development

rights "undoubtedly mitigate whatever financial burdens the law has imposed ... and, for that reason, are to be taken into account in considering the impact of regulation"); Deltona Corp., 657 F.2d at 1192 n. 14 (same); see also Carolina Power & Light Co. v. United States, 48 Fed.Cl. 35, 47 (2000).

Nonetheless, throughout this litigation, plaintiff has invoked Eastern Enterprises, supra and its antecedents, in asserting that its vessel was singled out for exclusion from the buy-out program and from participation in the pollack fishery—that, through the political maneuvering of the Alaska congressional delegation, the Arctic Trawler was the only vessel with significant pollack fishing history to be excluded from both programs. While such an allegation, if proven, might have raised interesting questions regarding the true nature of the government action here, this claim is wholly unsupported. Aside from the uncorroborated and self-serving allegations of its employees, plaintiff provided no direct evidence that, in the AFA, the Arctic Trawler was singled out by various Alaska politicians for exclusion from the pollack fishery because it was based in Seattle. Indeed, the legislative history suggests that the AFA was passed not to favor Alaskan vessels, but rather to minimize the waste of fish in the groundfish fisheries by factory trawlers by limiting their access to the fisheries, reducing overcapacity generally, and giving domestic vessels priority over foreign-owned vessels in allocating the fishery. Statements identifying these purposes and supporting the bill were made by various Senators, notable among them both Senators from Washington. See 144 Cong. Rec. S12,-707 (daily ed. Oct. 20, 1998) (statement of Sen. Murray); 143 Cong. Rec. S10,299–300 (daily ed. Oct. 1, 1997) (statement of Sen.

---

**45.** Under section 211(b) of the AFA, Congress restricted the harvest of catcher/processors receiving pollack allocations in terms of groundfish other than pollack from the BSAI fishery. In addition, section 211(a) of the AFA provided that "[t]he North Pacific Council shall recommend for approval by the Secretary such conservation and management measures as it determines necessary to protect other fisheries under its jurisdiction and the participants in those fisheries, including processors, from adverse impacts caused by this Act or fishery cooperatives in the

directed pollock fishery." Pursuant to the latter authority, various other regulatory constraints have been imposed on the vessels receiving pollack allocations under the AFA. See, e.g., 66 Fed. Reg. 7276 (2001) ( adopting further harvest specifications and associated management measures for the groundfish fisheries off Alaska). For a summary of the benefits of these various limits, see North Pacific Fishery Management Council, Report to the U.S. Congress and the Secretary of Commerce: Impacts of the American Fisheries Act (Sep. 10, 2001).

Breaux); 143 Cong. Rec. S9,972 (daily ed. Sept. 25, 1997) (statement of Sen. Stevens). Indeed, far from revealing geopolitical divisions, the legislative record reflects that the version of the AFA ultimately adopted was the result of unprecedented cooperation not only between the Alaskan and the Washington delegations, but also the fishing industry. *See, e.g.,* 144 Cong. Rec. S12,777 (daily ed. Oct. 21, 1998) (statement of Sen. Stevens); 144 Cong. Rec. S12707 (daily ed. Oct. 20, 1998) (statement of Sen. Murray); 144 Cong. Rec. S12,698 (daily ed. Oct. 20, 1998) (statement of Sen. Stevens); 144 Cong. Rec. S12,-801–02 (daily ed. Oct. 21, 1998) (statement of Sen. Gorton).[46]

Now perhaps it is unsurprising that there is no proverbial "smoking gun" in the record indicating that the Arctic Trawler had been targeted by powerful Alaskan interests because it was based in Seattle. However, one would still suspect there would be circumstantial evidence of this claim—some indication, for example, that plaintiff had been intentionally treated differently from others similar situated. But, there is none. While plaintiff argues that none of the vessels named in Section 208 had a pollack catch history during the periods required by Section 208(e)(21), in fact, all the named vessels had some pollack history recorded in either 1997 or 1998;[47] by comparison, the Arctic Trawler harvested no pollack from the middle of 1995 through 1998. Indeed, more than two dozen vessels that had significant catch histories in either 1997 or 1998 were excluded from both the pollack allocation and buyout; these vessels simply had less catch than the vessels that were explicitly deemed eligible by Congress. Three other boats that, like the Arctic Trawler, had significant catch histories from 1990 to 1996, but no reported catch in 1997 and 1998, were also excluded from both the allocation and the buyout. All three of these vessels, in fact, had greater total catch histories from 1990 to 1996 than the Arctic Trawler—two caught twice as much pollack.[48] As such, the record as a whole[49] amply indicates that plaintiff is sim-

**46.** Typical of these floor statements, some of which constituted the Conference Report for the AFA, were ones made by Senator Murray from Washington, who, shortly before the passage of the AFA, described the process that led up to this legislation, as follows:

When S.1221 was introduced by Senator Stevens in September 1997, one of the goals in addition to Americanizing the U.S. fishing fleet was to phase out a number of Seattle-based catcher processors that had used the grandfather provisions of the 1987 Anti–Reflagging Act to enter the pollock fishery. Senator Slade Gorton and I strongly opposed the original legislation because of the devastating impact this phase out would have had on Washington state jobs and the Puget Sound economy. However, there were a number of Washington state constituencies who strongly supported the legislation and the phase out of these catcher processors.

In the interest of resolving this issue, Senator Gorton convened a meeting in August 1998 of all the major participants in the North Pacific pollock fishery to explore the possibility of reaching a settlement of the dispute. My good colleague from Washington state established a number of principles which all the parties agreed to and guided the discussion of potential solutions. Those discussions led to the conclusion that 4 key issues needed to be addressed: Americanization, decapitalization, rationalization, and reallocation. This meeting led to a series of intense negotiations among the major North Pacific pollock fishery partici-

pants, led by Senator Stevens office, that provided the framework for the legislation before us.

144 Cong. Rec. S12,707 (daily ed. Oct. 20, 1998) (statement of Sen. Murray).

**47.** As evidence that it was singled out for disparate treatment under the AFA, plaintiff cited the alleged last-minute inclusion of the Brown's Point in the buyout program. However, while the Brown's Point did not have any recorded catch in 1998, it did have a significant pollack take in 1997, roughly comparable to that of the other vessels included in the buyout.

**48.** Relatedly, while plaintiff argued that, had the original LLP qualification been the standard for naming vessels for inclusion in the pollock fishery, the Arctic Trawler would have been the only additional vessel so named, in actuality, at least four other LLP qualified vessels with catch amounts similar to the Arctic Trawler would have been named. Moreover, several witnesses pointed out that had the AFA simply adopted the LLP qualification as its standard for participating in the fishery, it would not have effected the desired decapitalization of the BSAI pollack fishery.

**49.** Because the catch histories of the various vessels are protected trade information, the court, in making the above observations, has cited neither specific numbers nor names of vessels. The cited information, however, is readily deducible from Joint Exhibit 193.

ply wrong in contending that the Arctic King was the only vessel with a significant pollack history that was excluded from the pollack fishery by the AFA. Rather, the available statistics support defendant's claim that the intent of the AFA was not to single out plaintiff, but rather to rationalize the pollack fishing industry by redistributing the pollack fishing rights among those vessels arguably most deserving—those with a significant and recent pollack catch history.

In *American Pelagic I*, 49 Fed.Cl. at 36, this court, of course, held that the singling out of the vessel in question for regulation gave rise to a taking, albeit a temporary one. To be sure, *prima facie*, both cases involved vessels excluded from fisheries by legislation. But, there the similarities end. Unlike here, the vessel in *American Pelagic*, the Atlantic Star, had fished continuously in the Atlantic mackerel fishery and yet was the only vessel that met the narrowly tailored description of which boats were to be excluded from that fishery. That vessel's fishing licenses were retroactively revoked, even while the regulatory regime under which they were issued remained in effect for other boats, further signaling to the court that something was amiss. 49 Fed.Cl. at 49 ("Plaintiff could not have anticipated that Congress would single it out to revoke its permits by legislation."). And that revocation was accomplished not, as here, by a long-expected, comprehensive package of negotiated reforms, but rather in a rider to an appropriations bill, adopted with neither agency nor industry consultation. 49 Fed.Cl. at 42.[50] Moreover, in *American Pelagic I*, there was the legislative equivalent of a smoking gun—the legislative history of the rider indicated that plaintiff's large ship posed a threat to the local fishing industry and that representatives of that industry successfully targeted the ship in their lobbying efforts. 49 Fed.Cl. at 41, 51. Accordingly, in comparison to *American Pelagic I*, plain-tiff's contentions herein are but a hollow hull, wholly lacking in the proof of targeting and animus that the court earlier found persuasive.

### 4. Redux.

■ In its most recent explication of the takings analysis, the Supreme Court observed that *"Penn Central* does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required ...." *Tahoe–Sierra*, 535 U.S. at 327 n. 23, 122 S.Ct. 1465; *see also Cane Tennessee*, 57 Fed.Cl. at 122–23. Here, those guideposts all point to a single conclusion—that no compensation is owed because no taking occurred.

In this regard, summarizing the results of its analysis, the court concludes as follows:

**Economic Impact.** First, under the economic analysis prong, the court finds that the passage of the AFA diminished the value of plaintiffs' property by no more than 50 percent, and probably considerably less. Such a diminishment certainly does not constitute a categorical taking under *Lucas, supra*, where the Supreme Court held that a diminution of 93.7 percent did not constitute such a taking. While the Court in *Lucas* suggested that such a diminution might also not be indicative of a regulatory taking under the economic analysis factor under *Penn Central*, it refrained from drawing a bright line. Indeed, while courts have struggled with the dichotomy between compensable "partial takings" and noncompensable "mere diminutions," searching for a threshold beyond which diminution would be indicative of a taking, several Supreme Court decisions suggest that diminutions in value approaching 85 to 90 percent do not necessarily dictate the existence of a taking.[51] This court likewise

---

**50.** Regarding this rider, the court found:

This legislative approach to the revocation of fishery permits and authorization letters was unique. Never before had the NMFS revoked a fishery permit in response to a Congressional appropriation act. Congress did not consult with the United States fishery officials before deciding to nullify the *Atlantic Star's* permits or ask those officials to recommend or consid-er alternatives. Congress did not ask the NMFS what its opinion would be regarding the revocation of a fishing permit by act of Congress. 49 Fed.Cl. at 43.

**51.** *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75 percent diminution); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed.

has generally relied on diminutions well in excess of 85 percent before finding a regulatory taking.[52] Conversely, the Supreme Court, the Federal Circuit and this court all have held that a percentage of value loss comparable to that found here is not indicative of a taking.[53]

While this court is no better postured than others to snap a line dividing compensable from noncompensable exercises of government regulatory power, in the court's view, it stretches the concept of partial taking too far to say that a diminution on the order of 50 percent or less has the effect of a taking. As was recognized by the Supreme Court, "[o]nly when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the [property] in question can it be said that a taking has occurred." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). Such is not the case here.[54]

**Reasonable Investment–Backed Expectations.** Second, the court finds that the passage of the AFA did not upset plaintiff's reasonable investment-backed expectations. In particular, the court finds that, knowing that Congress likely would eventually address the overcapitalization problem in the BSAI pollack fishery, plaintiff risked that it could cease actively participating in the fishery and yet still receive a pollack allocation or buyout under whatever regulatory regime was ultimately adopted to effectuate a decapitalization. Things did not work as planned and plaintiff was excluded from the pollack fishery (albeit with other options)—not be-

cause the Congress failed to act in a reasonably foreseeable fashion, but because plaintiff miscalculated. Under these circumstances, plaintiff "cannot here insist on a guarantee of non-interference by government when [it] well knew or should have known that, in response to widely-shared public concerns, including concerns of the ... industry itself, government actions were being planned and executed that would directly affect [its] ... economic investments." *Avenal,* 100 F.3d at 937.

**Nature of the Governmental Action.** Third and finally, the court finds that while plaintiff's fishing activities did not constitute a nuisance, the Congress, in passing the AFA, legitimately addressed a real problem in a fashion that benefited the public and, in particular, the fishing industry, while minimizing the impact on vessels to be excluded from the BSAI pollack fishery. Critically, the record flatly contradicts plaintiff's claim that it was singled out by this legislation—there is neither direct nor circumstantial evidence of this. Indeed, all the reliable evidence is to the contrary, including proof that the reconfigured vessel has been profitable under the new regulatory regime.

## III.  CONCLUSION

This court need go no further. On this record, it concludes that the passage of the AFA did not effect a taking of plaintiffs' property. Rather, guided by the three-tiered *Penn Central* analysis, the court finds

348 (1915) (no taking despite 87.5 percent diminution).

52. *See Loveladies Harbor v. United States,* 21 Cl. Ct. 153, 160 (1990) (taking—99 percent), *aff'd,* 28 F.3d 1171 (Fed.Cir.1994); *Bowles v. United States,* 31 Fed.Cl. 37, 48–49 (1994) (taking—92–100 percent); *Formanek v. United States,* 26 Cl. Ct. 332, 340 (1992) (taking—88 percent); *see also 1902 Atl. Ltd. v. United States,* 26 Cl.Ct. 575, 579 (1992) (88 percent loss satisfies "economic impact" factor, although no taking found); *cf. Florida Rock Indus. Inc. v. United States,* 45 Fed.Cl. 21, 40–41 (1999).

53. *See Concrete Pipe,* 508 U.S. at 645, 113 S.Ct. 2264 (no taking—46 percent diminution); *Walcek,* 303 F.3d at 1355–56 (no taking—60 percent

diminution); *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210, 1213 (1981) (no taking—50 percent diminution); *Cane Tennessee,* 57 Fed.Cl. at 129 (no taking—49.6 percent diminution); *Ciampitti v. United States,* 22 Cl.Ct. 310, 320 (1991) (no taking—25 percent diminution); *see generally* David F. Coursen, *The Takings Jurisprudence of the Court of Federal Claims and the Federal Circuit,* 29 Envtl. L. 821, 848–51 (1999) (discussing these and other cases).

54. Based on the case law, this court would have concluded that the diminution in the value of the vessel was not indicative of taking even if plaintiff had been successful in demonstrating that the pre-AFA value of the Arctic Trawler was $2.0 million.

that this comprehensive reform of the rules governing the BSAI pollack fishery resulted, at best, only in a noncompensable diminution in the value of plaintiff's' property. The AFA, moreover, neither prevented plaintiff from realizing any reasonable investment-backed expectations nor targeted plaintiff in a fashion inconsistent with the offered reasons for the passage of the legislation. As such, the Clerk is directed to enter judgment dismissing the complaint.

**IT IS SO ORDERED.**